[Civ. No. 7594.   First Appellate District, Division One.—September 3, 1931.]

C. C. SCHLAGETER et al., Respondents, v. H. C. CUT-TING, Appellant.

Mark R. Averill, Sullivan, Roche, Johnson & Barry and M. S. Hamilton for Appellant.

Louis J. Trabucco and Louis T. Milburn for Respondents.

THE COURT.—This action was brought by plaintiffs to recover from defendant the sum of $2,500, alleged to be due under the terms of a certain written agreement. The case was tried by the court, without a jury, and judgment went for plaintiffs, as prayed. Defendant appeals.

On October 5, 1928, the plaintiffs as parties of the first part, and defendant as party of the second part, executed a certain instrument designated by its terms as an agreement of lease and option to purchase. It might be here noted that another party was associated with defendant in the beginning, but inasmuch as defendant had acquired all of the right, title and interest of his associate prior to the events surrounding the present controversy it is conceded here that the latter has no interest in the proceedings. Therefore, further reference to this feature of the agreement will be omitted and the discussion which follows will include only the parties to the action.

The salient parts of the agreement may be epitomized as follows: ''The parties of the first part hereby lease to the parties of the second part, . . . the following described mining ground with an option to purchase same, on the terms and conditions herein set forth.'' The property referred to consisted of two mining claims described as: ''The Patricia Mining Claim located in Quartzburg Mining District, Mariposa County, California, and recorded in Vol. 3 of Quartz Records, Mariposa County at page 333 and the Charles Mining Claim located in said district and same county and recorded in Vol. S, at page S.'' (*sic*), the claims being further described as adjoining claims. The parties of the first part guaranteed immediate and undisturbed possession for a period of two years from date of agreement and agreed further to place in escrow a good and sufficient deed for said mining ground made to parties of the second part within six months from the date of agree-

ment, provided that the parties of the second part began work on the ground within ten days and continued said work and paid to the escrow-holder for the parties of the first part, or their order, a royalty of fifteen per cent of the gross values extracted from ores taken from said ground until such royalties. should aggregate the sum of $17,500, which is the full purchase price for said claims, it being specifically provided, however, that should the royalties fail to reach the amount of the payments in the instrument provided, any difference must be made up by the parties of the second part. The payments provided for were as follows: namely, $2,500 on May 1, 1929; $5,000 on October 15, 1929, and $10,000 on October 15, 1930. The remaining provisions of the contract are unimportant, as far as the present controversy is concerned.

Under this agreement defendant entered upon the property and did commence active mining, embracing exploration and extraction and such development work as the agreement required. On May 1, 1929, defendant was still in possession of the property and in compliance with the agreement delivered to the escrow-holder the sum of $2,500 by check, which was subsequently reduced to cash and still remains with the said depositary. As will be noted from the terms of the instrument the parties of the first part were to place in escrow a good and sufficient deed conveying the property to the parties of the second part within six months after the date of the agreement. This provision would require that the deed be so deposited on or before April 5, 1929. It is conceded that the deed was not deposited until May 22, 1929, or thereabouts. No point is made on this delayed deposit, excepting in a rather perfunctorily inclusive way. Appellant here concedes that if the deed deposited meets the requirements of a good and sufficient deed the question of the delay is unimportant. In any event, the record discloses that all parties acquiesced in the delay and appellant made his payment to the escrow-holder, to be held until the deed was deposited. Clearly, under the record before us, the date of delivery becomes unimportant, inasmuch as appellant remained in possession of the property, continued operating the same and suffered no loss, directly or indirectly, through the failure of respondents in this respect. After the deposit of the deed, appellant refused to permit the release of the

money to respondents, claiming that the deed of conveyance was insufficient and did not convey the property contemplated in the agreement. Thereafter appellant removed from the ground.

Appellant, in seeking a reversal of the judgment, urges several grounds which will be taken up in the order presented.

First, appellant argues that the instrument in question was nothing but a mere option to purchase and was so found by the trial court; that the option was never exercised and therefore no cause of action exists against him. It is true that in the pleadings the agreement is denominated an agreement for the purchase and sale of certain property, but as a part of the allegation the agreement is pleaded *in haec verba*. Therefore whatever designation the parties might choose would not limit the terms of the instrument.

The writing itself shows the nature of the agreement, and from that writing it is obvious that while an option to purchase was given appellant, yet also the instrument is in the nature of a lease having a fixed term, with regular payments reserved at stated intervals. These payments were independent of the purchase, though in the exercise of the option by final payment all intermediate payments would be credited upon the total price. The terms of the lease provided that appellant should operate the property and from the ores extracted should pay respondent fifteen per cent of the gross values of all ores extracted, and that should appellant determine to exercise the option contained in the lease then all such payments as royalties should be applied on the stipulated purchase price. Yet irrespective of the royalties, there were certain definite payments provided for, upon which payments possession of the premises was conditioned. Whether these payments were in the nature of an exercise of the option to purchase or in the nature of rental under the terms of the lease could be determined only after the final payment had been made. It seems clear that if appellant had remained in possession and had made the first two payments and thereafter decided that he would not exercise the option by payment of the final installment, in which event there could have been no sale, the first two payments could not be classed as payments on the purchase, but rather as rental under the lease. On the other hand, appellant under his option was privileged to exercise the

same through installment payments applying on the purchase price. Therefore the payment of $2,500 to the escrow-holder under the terms of the agreement must be deemed a payment either as rental or on the purchase price. Appellant, here contending that the entire transaction was but an option to purchase, must then concede that the payment was made in the exercise of the option and if so made thereupon, at least *pro tanto*, and to an extent sufficient for present purposes, the transaction became one for the purchase and sale of the property. Whichever view we take, ample support is found for the trial court's conclusion that the amount of the payment—namely, $2,500, was due to the respondents under the terms of the contract. Appellant next raises the question as to respondents' ownership of the property involved. It is urged the record discloses that the ground involved is still unappropriated public domain and that respondents could not by any form of conveyance transfer title thereto. And further, that irrespective of the form of the deed, no title could thereby be conveyed by reason of respondents' lack of ownership.

It is argued that the Charles Mining Claim is not a full claim. In other words, that the ground embraced in the Charles Mining Claim does not embrace the usual twenty acres; that it is not 1500 feet long and 600 feet wide. This contention is based upon the wording of the location notice, which reads: "Commencing at a shaft . . . and running from said shaft . . . a distance of 750 feet in a Northerly direction and thence in a Southerly direction 750 feet to a stake." It is obvious that this description would take in only 750 feet of the lode, inasmuch as the second call was merely a retracing backward of the first line. We deem it unnecessary to go into any elaborate discussion of the rules governing construction of certificates of location. It is conceded that these notices are liberally construed and are to be read as a whole. If there are conflicting calls, it is of no consequence if there remain enough in the notice of location to identify the ground appropriated. The entire subject is discussed in Lindley on Mines, third edition, volume 2, section 379. The further description contained in the location notice would serve to identify the ground in any event. After the words quoted hereinbefore, the notice reads: "to a stake in mound of rock at each end

center, . . . The corners and side lines of this location are distinctly marked by stakes in mounds of rocks, and the same is situated about 2½ miles westerly from the town of Bear Valley, and was formerly . . . owned by Angelo Sperriero and recorded by him in book H. of Quartz Records at page 363 and 364 of said book, Mariposa County Records''. We know of no law or statute and none has been cited to us which either expressly or by construction requires that a mining claim be 1500 feet long and 600 feet wide. One may locate as much of the public domain as he desires, providing that each location shall be no larger than the area specified. In common parlance, a full claim has been deemed to be one exhausting the allotment of one location, but there is nothing to prevent a location of a smaller area. There is nothing in the agreement which specifies the Charles Mining Claim to be other than that ground located and described in the recorded notice, which notice is used as the means of description of the area involved. All that respondents agreed to do was to convey the Charles Mining Claim as the same appeared in the location notice recorded and this was what appellant agreed to accept, pursuant to the terms of the contract; the obligation of appellant being of course optional. In any event the subject of the contract was the mining ground described and in the absence of any effort at reformation or correction we must conclude that appellant knew of the boundaries of the location prior to his execution of the instrument.

■ Appellant next argues that the Patricia Mining Claim did not exist at all and that there was no valid location of the ground attempted to be embraced within the location. The description of the claim is as follows: ''Commencing at the Northwest center monument of the Charles Mine and running in a Northwesterly direction 1500· feet along the course of vein, lead or lode, to a stake. . . . The corners and side lines of said vein are distinctly marked so that the boundaries can be readily traced. Said location being situated in Sec. 19, Twp. 4 South, Range 17 East. and is on the Easterly slope of Bear Valley Mountain about 2 miles Northwesterly from the town of Bear Valley, and being the Northwesterly Extension of said Charles Mine and was formerly known as the Golden Gate Mine.'' Appellant contends that there can be no such point as the northwest

center monument of the Charles Claim for the reason that the latter claim, being a north and south claim, could have no northwest center monument. Referring again to the text, Lindley on Mines, and the numerous authorities therein cited, we accept the doctrine therein announced that if by any reasonable construction, in view of the surrounding circumstances, the language employed in the description will impart notice to subsequent locators, it is sufficient. If, as is true, there could be no northwest center monument, it is manifest that the descriptive word of location could not change the center. The notice did state that the claim commenced at the center monument and, as appellant points out, there could be no other center than that point actually midway between the east and west lines. The further description that the ground claimed was the northwest extension of the Charles Mining Claim would sufficiently identify the point of commencement. And, it being accepted that the course of the Charles lode or claim was northwest and southeast, the language employed was obviously for the purpose of adopting the north center monument as distinguished from the south center monument. ·

■ Next, appellant claims that there was no discovery sufficient to support the location of the Patricia, the location therefor being invalid. His argument goes to the effect that the discovery must be at the point of commencement or near thereto, and that the point of commencement being on the end line of located ground there is no unappropriated ground available for discovery. If the locator had made his discovery within two feet or two inches of the end line of the Charles Mining Claim he surely could adopt the monument of the latter claim as descriptive of his point of commencement. In any event, he is entitled to 1500 feet of the lode or vein discovered and if the north end line of the Charles Mining Claim intersected the vein we see no reason why he could not make his discovery within a thousandth part of an inch from this line, and monument his claim, and describe its boundaries, by accepting the monument of the Charles Claim as his point of commencement.

Passing this point, appellant then urges that, irrespective of the place of discovery, there was in fact no actual discovery made at any time or at any place upon the Patricia Claim. The only direct testimony in the record is that of

the locator that he found mineral upon the ground prior to his location. The statutes contemplate the discovery shall be of mineral bearing rock, earth or quartz in place or, as the code section words it, a discovery of "a vein or lode of quartz, or other rock in place, bearing gold, silver", etc. (Civ. Code, sec. 1426.) Here the direct testimony discloses no such discovery. However, there is the same liberality given to the construing of this section as to other provisions of the mining code or the statutes relating to the location of mines and mining claims. The location notice states the location to be in full compliance with the laws governing. The claim is an extension of another claim whereon there seems admittedly to have been a valid location subsequent to discovery. And further, the record discloses no intervening or conflicting claims to the area embraced within the location. The record further discloses that subsequent to the location and under the contract before us the property has been mined and developed and as a result of such work there has been taken therefrom gold in the value of in excess of $1200, aside from a quantity of specimen ores valued at approximately $500 or in excess of said amount.

A location, otherwise good, with a discovery made after location and before the intervention of adverse claims or the creation of adverse rights, will validate the location from the date of discovery, and generally from the first act toward claim and appropriation; this by relation. If the location be made before discovery but is followed by a discovery before any adverse rights intervene, such subsequent discovery cures the original defect and the claim is valid. (1 Snyder on Mines, p. 354; Morrison's Mining Rights, 11th ed., 32; *Creede etc. Min. Co.* v. *Uinta etc. Mining & Transp. Co.*, 196 U. S. 337, 345 [49 L. Ed. 501, 25 Sup. Ct. Rep. 266] ; *Tuolumne Cons. Min. Co.* v. *Maier*, 134 Cal. 583 [66 Pac. 863].) From the facts as hereinbefore stated, we conclude that respondents have made a sufficient *prima facie* case to warrant the holding that there has been a sufficient discovery to validate the location, even if we concede that there was no such discovery before location. The two claims here involved were worked together under the contract and ore was discovered and extracted in paying quantities. The appellant, in possession, as the lessee

of respondents, can hardly deny this discovery nor does he so do.

The foregoing disposes of the principal points urged by appellant. His attack upon the sufficiency of the deed seems to be on the theory that the deed in question is a mere quitclaim deed. Without passing upon the sufficiency of such a deed to convey title to unpatented mining claims, it will suffice to say that the deed before us is not a quitclaim deed. True, the words of conveyance include the term "quitclaim", but the full wording of the phrase of conveyance is "grant, bargain, sell, remise, release, and forever quitclaim", which phrase embraces every idea of transfer without warranty. And incidentally the deed runs to the heirs of the grantee. It is only essential that a deed or conveyance should use the word "grant" to convey an estate in fee simple absolute. (*Northwestern Pac. R. Co.* v. *Humboldt Milling Co.*, 186 Cal. 599 [200 Pac. 9].) In the transfer of unpatented mining claims it is always to be borne in mind that the paramount title rests in the sovereign, the right of the holder or owner being classed for all purposes as the fee, subject to defeasance through failure to comply with the statutory regulations governing. In the deed before us, the grantors have conveyed absolutely whatever right or claim they may have had to the premises and in addition thereto quitclaimed their defeasible right. We think the deed sufficient to convey the entire title of the grantors, which title we have found to be a good and marketable title based upon valid locations.

It is also urged that the findings of the trial court are not responsive to the pleadings in that there is no finding on the allegations of the cross-complaint of appellant. The said cross-complaint was but a repetition of the allegations of a counterclaim interposed upon which complete findings were made. It would be an idle thing to require a repetition of the findings on the allegations of the cross-complaint, inasmuch as the findings made completely disposed of the same issues.

Appellant throughout strenuously argues that if we determine that the judgment should be affirmed then it must follow that plaintiffs' only right to the money involved is conditioned upon appellant's exercise of the option, and that if the option was exercised then appellant was entitled

to the continued possession of the property and is entitled to damages for his ouster therefrom. This does not necessarily follow. After the money was delivered to the escrowholder and respondents had fully complied with the conditions surrounding the delivery to entitle them to receive the money, appellant refused to permit the release of the said fund. Appellant, at that time, was indebted to respondents on account of royalties due under the agreement, and the payment was made *pro tanto* in discharge of this liability, as well as for rental and purchase. As we have hereinbefore pointed out, this money was due respondents whether or not appellant desired to exercise the option of full purchase, as long as appellant held the property. Appellant did make the payment to the escrow-holder to be delivered to respondents when a sufficient deed was deposited. This having been done, respondents' title to the money became absolute. Thereafter, while both the money and the deed remained in the hands of the escrow-holder, appellant continued in possession of the property, extracting ore therefrom or at least working to that end, all of the time refusing to permit the escrow-holder to pay the money to respondents. If the situation had been permitted to remain thus indefinitely, the value of the property could have been exhausted and destroyed and, according to appellant's contention, no liability result.

The evidence is in conflict as to the actual departure of appellant from the property. However, there is sufficient in the record to indicate that, instead of appellant being put off the property, he left because he was afraid he would not be put off. The evidence sufficiently shows that respondents, upon their failure to obtain the money, repeatedly demanded that appellant release the same; that appellant refused to do so upon the claim that the locations were invalid as hereinbefore set forth. On June 7th, in a final effort to get the money, respondents informed appellant that if there were no release they would "close him up", to which appellant replied that he did not care what respondents did. Appellant in this connection testified that he could not afford to be tied up with any lawsuit and that upon the threat of respondents to close him up, he pulled out his machinery and left the property. We think this falls short of an eviction or even of a threat to evict. A reasonable

500

interpretation of the testimony supports the conclusion that the respondents intended to prevent further working of the property until payments had been made under the terms of the agreement and in this they were within their rights. If the appellant had released the money and withdrawn the next day the situation would have been no different than the one before us. As we have attempted to show, appellant had no further claim on the money paid to the depositary and the situation was identical with one wherein the money was paid without dispute, there being no reasonable ground for dissatisfaction or disagreement. There being no eviction, appellant's surrender of the premises was in the nature of and was an actual abandonment, and moneys theretofore paid under the contract were the property of the respondents.

The judgment is affirmed.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 3, 1931, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 2, 1931.