[S. F. No. 15992.   In Bank.—July 28, 1938.]

CITY OF LONG BEACH (a Municipal Corporation) et al., Petitioners, v. D. A. MARSHALL, as Port Manager, etc., Respondent; THE PEOPLE, Intervener.

George W. Trammell, Jr., City Attorney, Harlan V. Boyer, Assistant City Attorney, Henry D. Lawrence and John F. McCarthy, Deputies City Attorney, Swaffield & Swaffield and Roland G. Swaffield for Petitioners.

Markell C. Baer, Port Attorney (Oakland), W. Reginald Jones, Assistant Port Attorney, Ray L. Chesebro, City Attorney (Los Angeles), Clyde M. Leach, Assistant City Attorney, Loren A. Butts, Chandler, Wright & Ward, C. C. Stratton, Howard W. Wright, O'Melveny, Tuller & Myers, Louis W. Myers, A. L. Weil, Martin J. Weil, Cassel Jacobs and George R. Wickham, as *Amici Curiae,* on Behalf of Petitioners.

Frank M. Linnell for Respondent.

U. S. Webb, Attorney-General, and L. G. Campbell, Deputy Attorney-General, for Intervener.

Williamson, Hoge, Sargent & Judson, Harold Judson and Emil Steck, Jr., as *Amici Curiae,* on Behalf of Intervener.

LANGDON, J.—This is a petition by the City of Long Beach and its Board of Harbor Commissioners for a writ of mandate to compel respondent to take bids for the furnishing of a derrick and oil well. The proceeding presents the question whether the mineral rights, particularly those in oil and gas, in tidelands granted to the municipality by the state, are owned by the municipality.

The facts are not in dispute. At various times the state has by legislative act granted tidelands to municipalities, for the purpose of developing harbors and promoting commerce and navigation. The principal grant to petitioner, City of Long Beach, was made in 1911, and subsequent statutes relating to said grant were enacted in 1925 and 1935. In 1937 a rich oil deposit was discovered under these tidelands and adjoining private property. Private owners immediately commenced drilling on the contiguous private land, and are extracting enormous quantities of oil from the pool underlying the entire area. Shortly after the discovery, an amendment was adopted to the Long Beach freeholders' charter, expressly authorizing its Board of Harbor Commissioners to drill for and extract oil or other hydrocarbon substances from any of its land, including tidelands, provided that the board first found that the particular lands are not required and with reasonable certainty will not be required for a period of twenty-five years for the promotion of commerce, navigation or fishing. The section also provides that money derived from such oil development shall be used exclusively for improvement and maintenance of the harbor and servicing and redemption of outstanding harbor improvement bonds. This charter amendment was approved by the legislature on May 14, 1937. The Board of Harbor Commissioners, by resolution on January 31, 1938, found that the tidelands in question were not required for harbor purposes, as required by the said amendment. Thereafter the city commenced to drill wells, but its operations were stopped by a temporary restraining order in a taxpayer's suit on January 20, 1938. This suit was brought on the theory that the rights in oil and other minerals belonged to the state and not to the city. In order to secure a prompt determination of the issue and avoid some of the huge loss of oil through adjacent private drilling, this proceeding in mandate was commenced against respondent port manager,

and an alternative writ was issued by this court. The state, through the attorney-general, has intervened in the proceeding, asserting its claim to the mineral rights involved. Numerous *amici curiae* have appeared on both sides, and the matter has been exhaustively briefed.

The starting point of our discussion is the Act of 1911 (Stats. 1911, p. 1304) reading in part: "There is hereby *granted* to the City of Long Beach . . . *and to its successors all of the right, title and interest* of the State of California, held by said state *by virtue of its sovereignty,* in and to all of the *tide lands* and submerged lands, whether filled or unfilled, within the present boundaries of said City . . . *to be forever held by said city, and by its successors, in trust* for the uses and purposes, and *upon the express conditions* following . . . " It is then stated that "said lands shall be used by said city and by its successors, solely for the establishment, improvement and conduct of a harbor" and the construction of anything necessary or convenient for the promotion of commerce and navigation. It is further provided that "said city, or its successors, *shall not,* at any time, grant, convey, give or *alien said lands,* or any part thereof, to any individual, firm or corporation for any purpose whatsoever", provided that it may grant franchises for public uses, and leases for limited periods, for purposes consistent with the trusts upon which the lands are held. The final provision reads: "Reserving, however, in the people of the State of California the absolute *right to fish* in the waters of said harbor, with the *right of convenient access* to said waters over said lands for said purpose."

Giving this language its ordinary and reasonable meaning, it would seem clear that the state intended to and did convey whatever title or interest it had in these lands to the city, in fee simple, subject to certain conditions and upon certain trusts. A fee simple is presumed to pass by a "grant" of real property. (Cal. Civ. Code, sec. 1105.) The conditions, limiting the use of the lands to harbor purposes, and forbidding alienation of title to private persons, are entirely consistent with a conveyance of the fee simple title; the grantee of an estate on condition subsequent takes the fee, subject only to forfeiture for breach of the condition. (*Parry* v. *Berkeley Hall School Foundation,* 10 Cal. (2d) 422 [74 Pac. (2d) 738, 114 A. L. R. 562].) In short, there is nothing

on the face of the statute which suggests that the city did not take the title to the lands, and the assumption that it did has been made in numerous cases hereinafter mentioned, involving tidelands granted by the state to municipalities, before the present controversy over oil rights arose.

■ The attorney-general and *amici curiae* supporting his position contend, however, that there was no conveyance of the fee, and that the city received only the governmental power of administration of the lands, together with an easement or right to use them for specified purposes. This argument is largely based upon an interpretation of the statutory phrase ''held by said state by virtue of its sovereignty''. The state propounds the theory that there is a ''dual title'' or ''split fee'' in tidelands, consisting of the *jus privatum*, or proprietary right, and the *jus publicum*, or governmental right. The proprietary right, i. e., the ownership or title in the state's proprietary capacity, is subject to the governmental right, embracing the trusts for navigation, commerce and fishing upon which the state itself holds the lands for the benefit of its inhabitants. It is contended that the *jus privatum* or proprietary right was not intended to pass to the city; that only the *jus publicum* or governmental right passed; and that the city acquired no more than the authority and political power to establish, operate, govern and maintain a harbor, as a subordinate governmental agency.

We are unable to see any substance in the theory that the state's ownership of tidelands is so radically different from its ownership of other lands that a transfer by the state is not governed by the ordinary rules of interpretation of grants. There is neither logic in, nor practical necessity for the ''double fee'' doctrine. ■ It is established law that the state became the owner of tidelands in fee simple upon its admission to the union, holding them subject to the public trusts for navigation, commerce and fishing (*Shively* v. *Bowlby,* 152 U. S. 1 [14 Sup. Ct. 548, 38 L. Ed. 331]; *Borax Consolidated* v. *Los Angeles,* 296 U. S. 10 [56 Sup. Ct. 23, 80 L. Ed. 9]); that it likewise became owner of the minerals therein (*Boone* v. *Kingsbury,* 206 Cal. 148, 170 [273 Pac. 797]); and it should reasonably follow that it has the power to grant these lands to municipalities, subject to those same trusts. (See *Atwood* v. *Hammond,* 4 Cal. (2d) 31, 37 [48 Pac. (2d) 20]; *Los Angeles* v. *Pacific Coast S. S. Co.,* 45

Cal. App. 15, 17 [187 Pac. 739]; *Lloyd* v. *Redondo Beach,* 124 Cal. App. 541, 545 [12 Pac. (2d) 1087]; and *infra.*) There is nothing startling in the idea of a legislative grant of the fee to a city, subject to limitations and reservations, and there is no reason why the state, as proprietary owner of these tidelands, may not grant the fee in them, just as it may grant the fee in other lands held in its proprietary capacity.

█ An examination of the statute itself confirms this view. The title of the act is "An act *granting* to the City of Long Beach the tide lands and submerged lands of the State of California within the boundaries of said City." The language employed in the body of the act is in entire conformity with a grant of a proprietary interest in real property, and such terms as "grant", "right, title and interest", and "successors" are utterly improper as a means of delegating governmental dominion or control. It is difficult to conceive of the legislature choosing such inept language in dozens of these statutory grants throughout a period of many years, particularly when contemporaneous decisions were, as will be hereinafter seen, interpreting the statutes as vesting title in the municipalities. The phrase "by virtue of its sovereignty" is merely descriptive of the origin of the *state's title* to these lands; the conveyance is thus of tidelands which came to the state upon admission to the union, by virtue of its sovereignty, and not by grant from the federal government, as in the case of many other lands. (See *People* v. *Morrill,* 26 Cal. 336, 353; *Newcomb* v. *Newport Beach,* 7 Cal. (2d) 393, 400 [60 Pac. (2d) 825].) Such language cannot be distorted to mean that the *grant to the city* is only of rights of sovereignty in the sense of political or governmental power. The argument of the state's "double fee" is met by the very statutory language which grants the land, for it conveys "all" the "right, title and interest" of the state. Whatever the state had by way of title or interest, however divided it may have been, it all passed under the plain words of the grant.

█ The second argument advanced by the state and *amici curiae* is that if any interest in real property was conveyed, it was at most an easement, and not the fee title. Numerous cases are cited by both sides dealing with the interpretation of grants for specified purposes, with respect to

the question whether the fee was conveyed subject to conditions limiting its use, or whether an easement was granted for the specified use. (See, e. g., *Cooper* v. *Selig*, 48 Cal. App. 228 [191 Pac. 983]; *Parks* v. *Gates*, 186 Cal. 151 [199 Pac. 40].) They need not be discussed in detail, for the principles they lay down are not in conflict with our conclusion that the fee title to these tidelands passed to the city. The language granting "all right, title and interest" clearly indicates an intent to transfer the state's fee title. Whether this language is characteristic of a quitclaim deed or a grant deed is immaterial; in either case it would transfer whatever the state had, saving nothing to the state except the right of access expressly reserved. (See *Schlageter* v. *Cutting*, 116 Cal. App. 489, 498 [2 Pac. (2d) 875].) A conveyance of the "right, title and interest" of a grantor has been held to carry with it the mineral rights in the land. (See *McFarland* v. *Walker*, 40 Cal. App. 508, 511 [181 Pac. 248].) The restraints imposed upon alienation of the lands to private persons are likewise strong evidences of a transfer of the fee. A holder of an easement might purport to transfer his easement or right to use, but could never convey the lands; and the restriction on such alienation is a recognition of the fact that they might otherwise be alienable by the city as owner thereof. Finally, the express reservation of the right of access would hardly have been made if the state deemed itself still the owner in fee; it is indicative, therefore, of a conveyance of the title.

█ It remains only to point out briefly that the history of tideland grants in this state, and the actions of the various legislatures and the courts in connection therewith, show a general agreement that the tidelands were conveyed to municipalities in fee, subject only to the public trusts and the limitations and reservations specified in the acts; and that until the discovery of these valuable oil rights in the Southern California tidelands no serious doubt was ever expressed as to the title of the municipalities.

In 1911, the time of the grant involved herein, three other statutes were enacted, making tideland grants to Los Angeles, San Diego and Oakland, all of which are harbor cities. The San Diego statute is entitled "An act conveying certain tide lands . . . "; the other three are acts "granting . . . the tide lands . . . " Each of these four granting statutes deals

with the "lands"; each grant is to the city "to be forever held by said city, and by its successors"; each is subject to the same condition against alienation to private persons, and each contains the express reservation of the right of access. It has been suggested by *amici curiae* on behalf of the city that if the legislature had only intended to delegate governmental powers, it would have been simpler and just as effective to do so in a single statute applying to all of the cities concerned, and that these separate statutes were necessary because the intention was to convey title to specific parcels of real property, and to specific grantees thereof, rather than to establish political control by municipalities over certain tideland areas. Similar persuasive evidence of this sort is found in the series of tideland grants to the city of Oakland, eleven in number, commencing in 1852, and each granting a specifically described parcel.

In 1913 another statute (Stats. 1913, p. 437) was enacted to provide that any municipality "to which tide lands and submerged lands *have been granted* by the State of California, is hereby authorized and empowered to grant portions of such lands to the United States, for public purposes of the United States . . . " Here we have express statutory recognition of a prior *grant* of the lands themselves, subject, of course, to the restraint upon alienation already set forth. This later statute is designed to permit one type of alienation. It would be strange indeed, if the state, owning the fee title to the lands, could nevertheless permit the cities to convey them; and it can hardly be conceived that the city, as grantor, could "grant portions of such lands" if it did not own them. A similar recognition is found in section 5395 of the Harbors and Navigation Code (Stats. 1937, chap. 368), authorizing grants by a municipality to a municipal port district, of "tidelands", where "the state has granted all its right, title and interest" therein to the municipality. Again, the 1913 grant to the city of Alameda (Stats. 1913, p. 707), mainly in the usual form, contained a special provision giving certain private persons then in possession the right to obtain 25-year leases from a city, together with the right of renewal upon such terms as the city might specify, and thereupon such persons "shall quitclaim to said city any right they or any of them may claim or have to the said lands hereby granted". Clearly this quitclaim was intended

to eliminate any possible cloud on the city's title, and is inconsistent with the theory that the title was in the state. The above-quoted section of the Harbors and Navigation Code contains a further significant provision that if a district to which grants are made by the municipality is dissolved, the land "reverts to and is revested in the municipal corporation so granting the same to the district".

The subsequent statutes dealing with the Long Beach lands likewise exhibit a legislative recognition of a grant of the fee. The 1925 act (Stats. 1925, p. 235) designed to remove some of the restrictions on the use of the lands and to permit it to be devoted to such uses as "public park, parkway, highway, playground", etc., is in the form of a new grant to the city. The same language is used, granting to the city "and to its successors", all of the right, title and interest of the state, "to be forever held by said city", subject to the restrictions and reservations. The 1935 act (Stats. 1935, p. 793) amends the 1925 act so as further to enlarge these purposes, and exactly the same terminology of grant is again employed. The 1937 charter amendment (sec. 229x) approved by the legislature on May 14, 1937 (Stats. 1937, p. 2939) expressly confers a right to drill for oil on tidelands, a meaningless authorization if the city wholly lacked title to the lands or ownership of the minerals.

It may be added that at the time of the 1935 act, the possibility of oil underlying tidelands in this general area was known to the legislature, through litigation and discussion of such cases as *Boone* v. *Kingsbury, supra,* but no attempt was made to assert title to the minerals or oil rights in the lands theretofore granted. On the other hand, in contemporaneous grants to other cities such as Santa Barbara (Stats. 1931, p. 1742), Ventura (Stats. 1935, p. 869), and Santa Cruz (Stats. 1935, p. 1876), the legislature expressly reserved to the state the mineral rights in the lands. In other respects, the terms of the legislative grants in these instances were similar to the earlier ones, particularly in the clause granting "all of the right, title and interest of the State of California, held by said state by virtue of its sovereignty".

The decisions of this court have been equally uniform in their declaration that the cities by these various grants took title to the tidelands. We had occasion to review them in

the recent case of *Atwood* v. *Hammond, supra,* dealing with the San Diego lands, and we there said:

"Defendants city and county of San Diego contend that the act of 1911 was not a conveyance of land to the city as sole owner, but only a grant to it of a right to make improvements in the harbor, with the right to lease wharves, piers and other harbor facilities, and to collect rents therefor. *The language of the act refutes this contention.* The title of the act describes it as 'an act conveying certain *tidelands* . . . The preamble of the act refers to the power of the state 'to *convey* to municipalities limited and defined areas of such *lands*' in the interests of commerce, navigation and fishing. By its terms the act *grants* and *conveys lands* lying between the line of mean high tide and the pierhead line in the bay. Provisions prohibiting alienation of the *lands* described, and providing for reversion to the state of 'the *lands* by this act conveyed', upon a violation of any of the provisions of the act, are inconsistent with defendants' position that no lands were granted to the city . . . "

"Grants of waterfront lands *similar in form and expression* to the Act of 1911 have been *interpreted repeatedly as conveyance* to municipalities of tidelands subject to the public trust for navigation and commerce (cases cited). . . . That there may be a delegation of the right to make harbor improvements, without a conveyance of the legal title in the land is recognized in *People* v. *Banning Co.,* 166 Cal. 630 [138 Pac. 100]. But the grant made to the city of San Diego by the Act of 1911 is not of such nature."

To the same effect are *Los Angeles* v. *Pacific Coast S. S. Co.,* 45 Cal. App. 15 [187 Pac. 739]; *Lloyd* v. *Redondo Beach, supra; Newcomb* v. *Newport Beach,* 7 Cal. (2d) 393, 402 [60 Pac. (2d) 825], and many other decisions cited in *Atwood* v. *Hammond, supra.* See, also, *Long Beach* v. *Lisenby,* 175 Cal. 575 [166 Pac. 333], dealing with the tidelands involved herein.

The attorney-general seeks to avoid the force of these decisions by pointing out that nearly all of them were proceedings to which the state was not a party. This would be a proper objection were the decisions deemed to foreclose the state's claim of title in and of themselves. However, they are cited herein not as a conclusive determination against the state, but as sound authority for the construction of the

statutory grants, and we have herein approved the reasoning upon which they are based.

It should be noted also, in this connection, that while this long series of decisions declaring that title vested in the municipalities under these legislative grants were being rendered, the legislature continued to make further grants in the same language. The conclusion is very strong that the legislature considered that these decisions correctly stated the purport and effect of the acts, and therefore declared the true legislative intent. And the rule of law is well established that where the legislature uses terms already judicially construed, "the presumption is almost irresistible that it used them in the precise and technical sense which had been placed upon them by the courts". (*Long Beach* v. *Payne*, 3 Cal. (2d) 184, 191 [44 Pac. (2d) 305]; see, also, *Anderson* v. *Jameson Corp.*, 7 Cal. (2d) 60, 67 [59 Pac. (2d) 962].)

The final question is whether the city has the right to drill for and extract the oil from these lands which it owns. Nothing in the grant purports to reserve to the state or to deny to the municipality the minerals or the right to extract them. Moreover, the charter amendment, section 229x, approved by the legislature in 1937, expressly and unequivocally empowers the city to drill, develop, take and dispose of oil on tidelands owned by it. Hence, the ownership of the lands being once established in the city, its authority to do the acts contemplated is placed beyond question by this express charter provision. It is, of course, true that the operations must not be conducted in such manner as to impede the use of the harbor, but there is nothing before us to suggest that drilling will have any such effect. (See *Boone* v. *Kingsbury*, 206 Cal. 148, 183 [273 Pac. 797].)

The state places considerable reliance on the case of *Stone* v. *Los Angeles*, 114 Cal. App. 192 [299 Pac. 838], where the defendant city's playground department sought to execute an oil *lease* on tidelands acquired by legislative grant. It was held that the city lacked power to make the lease, the theory of the decision being that the oil in place was part of the realty, and that by its removal the city had effected a prohibited transfer of a part of the freehold, in violation of the restraints on alienation imposed by the statute. It is apparent· that the Stone case is distinguishable from the

present proceeding, for the court was dealing only with the city's power to lease, and the opinion is explicit in thus limiting the issue, pointing out that the city itself is not attempting to drill. (114 Cal. App. 198.) Another basic distinction is that the city in that case was acting without any statutory authorization; here a charter provision, approved by the legislature, expressly authorizes the drilling for and extraction of oil. And it should be noted, finally, that the conclusion reached in the Stone case to the effect that an oil lease is an unlawful transfer of tidelands is contrary to the holding by this court in the later case of *Boone* v. *Kingsbury, supra,* at page 184.

The complaint that these valuable properties should not be taken from the people of the state and given to one community is one that can have no weight in this proceeding. We are concerned not with the policy of the statute but with its effect; and if the legislature, without knowledge of the hidden treasures in these lands, made improvident grants thereof, it is not within the power of the courts to nullify them.

It follows that petitioners are entitled to the relief demanded. Let a peremptory writ of mandate issue as prayed for.

Curtis, J., Shenk, J., Edmonds, J., Houser, J., Waste, C. J., and Seawell, J., concurred.

Rehearing denied.