[L. A. No. 25119. In Bank. Apr. 22, 1959.]

THE PEOPLE et al., Appellants, v. CITY OF LONG BEACH, Respondent.

Stanley Mosk and Edmund G. Brown, Attorneys General, Leonard M. Friedman, Assistant Attorney General, and F. G. Girard, Deputy Attorney General, for Appellants.

Theodore R. Gabrielson as Amicus Curiae on behalf of Appellants.

Walhfred Jacobson, City Attorney, O'Melveny & Myers and Pierce Works for Respondent.

TRAYNOR, J.—In 1911, the State of California granted to the city of Long Beach the tidelands and submerged lands lying within the city's boundaries in trust for certain uses and purposes connected with the development of Long Beach Harbor. (Stats. 1911, ch. 676, p. 1304.) The original grant stated "That said lands shall be used by said city and by its successors, solely for the establishment, improvement and conduct of a harbor, and for the construction, maintenance and operation thereon of wharves, docks, piers, slips, quays, and other utilities, structures and appliances necessary or convenient for the promotion and accommodation of commerce and navigation, and said city, or its successors, shall not, at any

time, grant, convey, give or alien said lands, or any part thereof, to any individual, firm or corporation for any purpose whatsoever; *provided,* that said city, or its successors, may grant franchises thereon, for limited periods, for wharves and other public uses and purposes, and may lease said lands, or any part thereof, for limited periods, for purposes consistent with the trusts upon which said lands are held by the State of California and with the requirements of commerce or navigation at said harbor. . . ." (Stats. 1911, ch. 676, p. 1305.) The terms of the original trust were amended by the Legislature in 1925 (Stats. 1925, ch. 102, pp. 235-236) and 1935. (Stats. 1935, ch. 158, pp. 793-795.)

Following the discovery of oil under the tidelands in 1937, it was determined in *City of Long Beach* v. *Marshall,* 11 Cal. 2d 609 [82 P.2d 362], that the city had the right to produce oil and gas from these lands, and in *City of Long Beach* v. *Morse,* 31 Cal.2d 254 [188 P.2d 17], that the oil and gas revenue could be used only for trust purposes. In 1951, the Legislature found that approximately 50 per cent of the oil and gas revenue was no longer needed for trust purposes and declared such part of the revenue free from the public trust for navigation, commerce, and fisheries. (Stats. 1951, ch. 915, pp. 2444-2445.) In *Mallon* v. *City of Long Beach,* 44 Cal.2d 199 [282 P.2d 481], it was determined that the state, not the city, was entitled to the revenue freed from the trust by its partial revocation.

Thereafter the state brought an action against the city to recover the funds to which it was entitled under the decision in the Mallon case. In 1956 the Legislature took note of this litigation and concluded that the public interest would best be served by its prompt settlement. Accordingly, it authorized a settlement dividing the oil and gas revenue between the state and the city, and provided that the latter's share should continue to be held in trust and expended for trust purposes. It set forth a nonexclusive list of trust purposes that were declared to be matters of state, as distinguished from local, interest and benefit, and it expressed its belief "that the Attorney General and said city should seek judicial determinations further defining said city's rights and duties in the premises." (Stats. 1st Ex. Sess. 1956, ch. 29.) Pursuant to this legislation a consent decree was entered settling the main points of dispute between the state and the city, but the trial court reserved jurisdiction to determine whether given proposed expenditures were or were not within the power of the city to

make as trustee in possession of its share of the oil and gas revenue.

Thereafter the city commenced the present proceedings to secure a declaration of its right to use trust funds to construct a building to be leased to the National Board of the Young Men's Christian Association. The trial court entered judgment approving the proposed expenditures and lease. The state appeals.

Since 1936 the Y.M.C.A. has been operating a facility known as the Armed Services Y.M.C.A. on tidelands leased from the city at a rental of $1.00 per year. This facility was erected without cost to the city, and the lease was executed pursuant to the 1935 amendment to the trust terms, which provided "That nothing herein contained shall be so construed as to prevent . . . the leasing or use of such tidelands or submerged lands for limited periods for the construction, maintenance, and operation of nonprofit benevolent and charitable institutions organized and conducted for the promotion of the moral and social welfare of seamen, naval officers and enlisted men, and other persons engaged in and about the harbor and commerce, fishery, and navigation." (Stats. 1935, ch. 158, p. 794.) Owing to freeway construction, the relocation of the Navy Landing, and soil subsidence, the Armed Services Y.M.C.A. requires a new building at a new location if it is to continue adequately to serve its purposes. The city proposes to construct this building on a tideland site with tideland revenue at a cost of over $900,000 and lease it for 25 years to the Y.M.C.A. for the continued operation of the Armed Services Y.M.C.A.

The proposed lease provides that the "Lessee shall use the demised premises, together with the building and facilities located thereon, solely and exclusively for the purposes of, and it shall devote its special knowledge and experience to, managing, operating, conducting and maintaining therein and thereon, without compensation for its services in so doing, a rest, recreation and entertainment center for the use and accommodation of, and for the benefit and for the promotion of the moral and social welfare of, members of the Armed Forces of the United States, merchant seamen and other persons engaged in and about the harbor and in commerce and navigation. . . ." It shall provide suitable dormitory and sanitary accommodations; adequate meal service; suitable entertainment; and "such additional services and facilities, including a social room, lounge, game room, lockers, showers, telephone booths,

and tailor shop, as are of a nature consistent with the proper operation of a well-conducted rest, recreation and entertainment center according to the knowledge and experience of the Lessee.'' It must operate the center without discrimination as to race, color or creed. It may make reasonable charges for food and other merchandise sold and for services rendered at prices and rates approved by the city manager. It expressly recognizes that the facilities are subject to the public trust for navigation, commerce, and fishery and agrees that the city retains full powers of supervision to insure that it operates the facility in a manner strictly consistent therewith and fully discharges its obligations under the lease. The rental is $1.00 per year plus an amount equal to any net profit derived from the operation of the facility, but past experience indicates that no profits will be realized and that the Y.M.C.A. will be required to cover a substantial deficit from its own funds.

We entertain no doubt that the specific purpose set forth in the 1935 statute to promote ''the moral and social welfare of seamen, naval officers and enlisted men, and other persons engaged in and about the harbor and commerce, fishery, and navigation,'' is not only consistent with but in direct aid of the basic trust purpose to establish and maintain a harbor and necessary or convenient related facilities for the ''promotion and accommodation of commerce and navigation.'' (Stats. 1911, ch. 676, p. 1305.) Personnel are as vital to these activities as the ships and other facilities used therein, and no distinction can properly be drawn between providing dormitories and other facilities for maritime personnel and docks for ships, warehouses for goods (*City of Oakland* v. *Williams,* 206 Cal. 315, 331 [274 P. 328]), or convention, exhibition, and banquet halls for use by trade, shipping, and commercial organizations. (*Haggerty* v. *City of Oakland,* 161 Cal.App.2d 407, 413 [326 P.2d 957]; see also *Ravettino* v. *City of San Diego,* 70 Cal.App.2d 37, 47-48 [160 P.2d 52].)

It is true that these purposes may also be of sufficient local concern to justify the expenditure of purely municipal funds therefor (see *City of Oakland* v. *Williams,* 206 Cal. 315, 318 [274 P. 328]; *Haggerty* v. *City of Oakland,* 161 Cal. App.2d 407, 412 [326 P.2d 957]; *City of Oakland* v. *El Dorado T. Co.,* 41 Cal.App.2d 320, 330 [106 P.2d 1000]), but as purposes of the trust for commerce, navigation, and fishery they are also for the benefit of all of the people of the state (*Mallon* v. *City of Long Beach,* 44 Cal.2d 199, 205 [282 P.2d

481] ; *City of Long Beach* v. *Marshall,* 11 Cal.2d 609, 614 [82 P.2d 362]), and accordingly trust income may properly be devoted thereto. (Stats. 1st Ex. Sess. 1956, ch. 29, p. 347; see also *City of Oakland* v. *Garrison,* 194 Cal. 298, 304 [228 P. 433] ; *City of Los Angeles* v. *Riley,* 6 Cal.2d 621, 623 [59 P.2d 137] ; *City of Long Beach* v. *Lisenby,* 175 Cal. 575, 583-584 [166 P. 333] ; *Ransom* v. *Los Angeles City High School Dist.,* 129 Cal.App.2d 500, 506 [277 P.2d 455].)

The state contends, however, that to expend trust funds to construct a building to be leased at nominal rent to a private organization violates sections 22 and 31 of article IV of the Constitution. It relies on the provisions that "no money shall ever be appropriated or drawn from the State Treasury for the purpose or benefit of any corporation, association, asylum, hospital, or any other institution not under the exclusive management and control of the State as a state institution, nor shall any grant or donation of property ever be made thereto by the State; . . ." (§ 22) and that the "Legislature shall have no power . . . to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever." (§ 31.) The city contends that neither of these provisions prohibits expenditures of tideland trust funds for public purposes of statewide concern, even though a private organization may also benefit thereby. (See *Simpson* v. *City of Los Angeles,* 40 Cal.2d 271, 282 [253 P.2d 464] ; *County of Los Angeles* v. *La Fuente,* 20 Cal.2d 870, 877 [129 P.2d 378] ; *County of Alameda* v. *Janssen,* 16 Cal.2d 276, 281 [106 P.2d 11, 103 A.L.R. 1141].)

We may assume without deciding that a grant in aid to a private organization is a "gift" to and "for the purpose and benefit of" such organization within the meaning of the constitutional provisions even though the organization is thereby enabled to promote some public purpose. (See *People* v. *San Joaquin etc. Assn.,* 151 Cal. 797, 800-801 [91 P. 740] ; *County of Los Angeles* v. *Southern Calif. Tel. Co.,* 32 Cal.2d 378, 387-388 [196 P.2d 773] ; *Sixth District etc. Assoc.* v. *Wright,* 154 Cal. 119, 129 [97 P. 144] ; *County of Alameda* v. *Ross,* 32 Cal.App.2d 135, 141 [89 P.2d 460] ; *Frohliger* v. *Richardson,* 63 Cal.App. 209, 217 [218 P. 497] ; *Allen* v. *Hussey,* 101 Cal.App.2d 457, 474 [225 P.2d 674] ; *cf., Simpson* v. *City of Los Angeles,* 40 Cal.2d 271, 282 [253 P.2d 464].) It is clear, however, that the performance of a bona fide contract by a public body is not the making of a gift, nor is it "for the purpose and benefit of" the private contractor within

the meaning of section 22, for if it were, the state would be powerless to contract with any organization not expressly exempted from the constitutional limitations.

In the present case, the state contends that the carrying out of the city's plan must be regarded as a gift of the use of a valuable building for 25 years to the Y.M.C.A. to enable it to perform its private charitable purposes and that such a gift cannot be justified solely because a public purpose will also be served. The city contends that the benefits derived by the Y.M.C.A. are merely incidental to the public purpose and that the Y.M.C.A.'s performance of its obligations under the lease will constitute full and adequate consideration for its use of the building.

*County of Los Angeles* v. *Southern Calif. Tel. Co.*, 32 Cal. 2d 378 [196 P.2d 773], compels the resolution of these conflicting contentions in favor of the city. In that case the court sustained the grant of a franchise to a public utility pursuant to Civil Code, section 536, and drew a distinction between such a grant and an absolute grant in fee or an appropriation of public money. ''A franchise such as is authorized by section 536 is not an absolute grant in fee or an appropriation of money, but is merely a limited right to use the highways and only to the extent necessary for the furnishing of services to the public. Also, the privilege must be exercised 'in such manner and at such points as not to incommode the public use of the road or highway.' (Civ. Code, § 536.) It is obvious that the right acquired by the company is of less substance than the transfers involved in the cited cases which condemn appropriations of money and grants in fee.

''Moreover, the state is assured of a continuing benefit in return for the privilege granted under section 536, whereas this may not be true in transactions involving an outright appropriation or transfer in fee. The company must not only construct a telephone system but it must render service, and if it fails to do so the franchise terminates. Thus the state receives benefits during the life of the franchise, since in order to retain it the company must continue to serve the public. If and when the public benefit ceases and the franchise expires, the state is in as good a position as it was before the limited privilege was granted. The building of a public utility and consequent benefit to the people may not be a sufficient consideration to support a grant in fee, but it does not follow that the benefit received from the construction and continued operation of a telephone system is not an adequate consideration for

the use of the highways so long as the public service continues.'' (32 Cal.2d at 387-388.)

In the present case there is also no grant in fee or appropriation of money to a private organization. The Y.M.C.A. receives only the use of the building for 25 years on condition that at all times it carries out the trust purposes for the public benefit under the supervision of the city. When it ceases to do so its rights in the building terminate. Moreover, it can gain no monetary benefit from the lease. Thus, other than the goodwill that it may engender for itself, the sole benefit it will derive is the ability to promote a public trust purpose that happens also to be one of its own. Under these circumstances, the public benefit that will result from the Y.M.C.A.'s operation of the facility at its own expense is clearly sufficient consideration for the Y.M.C.A.'s use of the building and such incidental nonmonetary benefits as it may receive.

Finally the state contends that the lease will violate the civil service provisions of the Long Beach city charter on the ground that those provisions require the city to execute the trust purposes itself by means of civil service personnel. There is no merit in this contention. The administration of the tidelands trust for the benefit of all of the people of the state is not a municipal affair, and the statutes creating the trust and regulating its administration expressly authorize leases to promote its purposes. Accordingly, any conflicting limitations in the city charter are inapplicable. (*Civic Center Assn.* v. *Railroad Com.*, 175 Cal. 441, 445 [166 P. 351]; *Pasadena* v. *Charleville*, 215 Cal. 384, 388 [10 P.2d 745].)

The judgment is affirmed.

Gibson, C. J., Shenk, J., Schauer, J., Spence, J., McComb, J., and Peters, J., concurred.