[L. A. No. 26056. In Bank. Jan. 20, 1961.]

CITY OF LONG BEACH et al., Petitioners, v. CHARLES L. VICKERS, as General Manager of the HARBOR DEPARTMENT OF THE CITY OF LONG BEACH, Respondent; STATE OF CALIFORNIA et al., Real Parties in Interest.

*Assigned by Chairman of Judicial Council.

Gerald Desmond, City Attorney, John C. Spence, Jr., Assistant City Attorney, Ball, Hunt & Hart and Joseph A. Ball for Petitioners.

Mason, Kinley & Wallace and Donald C. Wallace, Jr., for Respondent.

Stanley Mosk, Attorney General, John F. Hassler, Deputy Attorney General, O'Melveny & Myers, Pierce Works, Richard C. Bergen, William W. Alsup, Bruce Renwick, Rollin E. Woodbury, Lynn O. Hossom, R. P. Lavenant, Jr., Trippet, Yoakum & Ballantyne and Oscar A. Trippet for Real Parties in Interest.

TRAYNOR, J.—Petitioners, the city of Long Beach, and its Board of Harbor Commissioners, seek a writ of mandate to compel respondent Vickers, General Manager of the Harbor Department of the city, to execute unit agreements and unit operating agreements that provide for a unitary production of oil and gas from two oil and gas pools underlying city-owned tide and submerged lands and privately owned adjacent uplands. Real parties in interest, the State of California, the State Lands Commission, and the upland owners, join in seeking the writ. Respondent has demurred to the petition for the writ.

The Wilmington oil field underlies the city of Long Beach and is divided into six fault blocks by five major subsurface geological faults that run in a generally northerly and southerly direction across the field from the Pacific Ocean to the uplands. The faults are underground barriers that prevent any substantial migration of oil or gas from one fault block to another. Since the discovery of the field in 1938, there has been serious subsidence of the overlying lands, which has centered in fault blocks II and III. Such subsidence can be arrested or ameliorated by repressurizing the field, but repressuring operations can be carried out successfully only if each fault block is operated as a unit.

The Legislature has determined that unitary operation of oil and gas fields is necessary to arrest or ameliorate subsidence when it has occurred. It has provided for such operation under the supervision of the Supervisor of Oil and Gas (Pub. Resources Code, §§ 3315-3347), and it has authorized cities to participate therein (Pub. Resources Code, §§ 6879, 7058). Such participation is also authorized by the charter of the City of Long Beach. (§ 229x, subd. f.) Pursuant to this statutory and charter authority, unit agreements and unit operating agreements have been drafted providing for unit operation of fault blocks II and III.

Under the agreements the parties are defined as either working interest owners or royalty interest owners. Working interest owners include the city of Long Beach and others who have rights to drill for, develop, and produce oil and gas by

reason of fee title, trust interests, or contract rights. The State of California owns a beneficial interest under the tidelands grants to the city, but it is not required to execute the agreements. Section 6879 of the Public Resources Code provides that when approved by the State Lands Commission the agreements bind the state and all parties executing them.

The working interest owners are granted the power to supervise and control the drilling, operating, and repressuring of the land in each unit. Each fault block is divided into two segments. Segment 1 of each unit includes the tide and submerged lands, and segment 2 includes the uplands. The city is the unit operator of segment 1 in each unit, and the Union Pacific Railroad Company is the unit operator of segment 2 in each unit. Subject to the instructions of the working interest owners, each unit operator has the exclusive right, and is obligated, to develop and operate its segment. Union Pacific is the unit coordinator for both units and has general control over the operations of the unit operators subject to the instructions of the working interest owners.

Each parcel of land is initially assigned a share of unit participation based upon the ratio of its production in 1958 to the total production from all parcels in the unit in 1958. On the completion of engineering studies, each parcel's share of unit participation will be determined by a specified formula. Each working interest owner has a voting right equal to its share of unit participation, and no single working interest owner can control unit operations.

Except for specified reserved areas, working interest owners must make available all well sites and unit facilities required for unit operations and may be required to bear the expense of repairing dikes and levees on their land. The unit operators and unit coordinator may require working interest owners to advance their share of proposed unit expenses and are granted a lien upon the share of production allocated to each working interest owner to pay for unit operations. The working interest owners agree to indemnify the unit operators and unit coordinator in proportion to their interests for damages caused by unit operations.

Production from all wells will be commingled so that each working interest owner and royalty interest owner will receive his pro rata share of the total production from the unit. All production allocated to the tide and submerged lands is deemed to have been produced from such lands.

The agreements also provide that they will not cause or result in a transfer of title to any land or create a joint owner-

ship of any land; that they will not impair any public trust or result in any grant, alienation or transfer of any tide or submerged land; and that the city will be reimbursed from anticipated increased production for the cost of wells it has already drilled and equipped for repressuring operations.

The State Lands Commission approved the agreements on February 18, 1960 (see Pub. Resources Code, § 6879), and the Supervisor of Oil and Gas approved them on February 25, 1960 (see Pub. Resources Code, § 3320.1, subd. (a)). They were also approved by the Board of Harbor Commissioners and the City Council of Long Beach, and as soon as necessary amendments were made to the city's agreement with the company currently producing oil and gas from its land, the board directed respondent to execute the unit agreements and unit operating agreements. He has refused to do so on the ground that the proposed agreements are invalid.

The city's interest in the lands involved dates from 1911 when the State of California granted to the city the tidelands and submerged lands lying within the city's boundaries in trust for certain uses and purposes connected with the development of Long Beach Harbor. (Stats. 1911, ch. 676, pp. 1304, 1305.) The terms of the original trust were amended by the Legislature in 1925 (Stats. 1925, ch. 102, pp. 235, 236) and 1935 (Stats. 1935, ch. 158, pp. 793-795). Following the discovery of oil under the tidelands in 1937, it was determined in *City of Long Beach* v. *Marshall*, 11 Cal.2d 609 [82 P.2d 362], that the city had the right to produce oil and gas from the lands, and in *City of Long Beach* v. *Morse*, 31 Cal.2d 254 [188 P.2d 17], that the oil and gas revenue could be used only for trust purposes. In 1951, the Legislature found that approximately 50 per cent of the oil and gas revenue was no longer needed for trust purposes and declared such part of the revenue free from the public trust for navigation, commerce, and fisheries. (Stats. 1951, ch. 915, pp. 2444, 2445.) In *Mallon* v. *City of Long Beach*, 44 Cal.2d 199 [282 P.2d 481], it was determined that the state, not the city, was entitled to the revenue freed from the trust by its partial revocation. Thereafter the state brought an action against the city to recover the funds to which it was entitled under the decision in the Mallon case. In 1956 the Legislature took note of this litigation and concluded that the public interest would best be served by its prompt settlement. Accordingly, it authorized a settlement dividing the oil and gas revenues between the state and the city, and provided that the latter's share should continue to be

held in trust and expended for trust purposes. It also regulated future contracts for the production of oil and gas. (Stats. 1956, 1st Ex. Sess., ch. 29.)

In 1957 the Legislature enacted section 6879 of the Public Resources Code, which provides:

"Whenever tide and submerged lands of the State have been granted to a city, county or city and county by a grant which does not reserve to the State the right to produce oil and gas therefrom, and such grantee shall determine that it is in the interest of increasing the ultimate recovery of oil or gas from such lands, or of the protection of oil or gas in said lands from unreasonable waste, or that the subsidence or sinking of such lands and abutting lands may possibly be arrested or ameliorated thereby, such grantee may enter into agreements for the purpose of bringing about the cooperative development and operation of all or a part or parts of the oil and gas field in which such lands are located, or for the purpose of bringing about the development or operation of all or a part or parts of such field as a unit, or for the purpose of fixing the time, location, and manner of drilling and operating of wells for the production of oil or gas, or providing for the return or injection of gas, water or other substances into the subsurface of the earth for the purpose of storage or the repressuring of such oil or gas field.

"Each such agreement shall provide that any impairment of the public trust for commerce, navigation or fisheries to which said granted lands are subject is prohibited, and shall be submitted to the State Lands Commission for approval. If the State Lands Commission shall find that said agreement so provides and that the entering into and the performance of such agreement is in the public interest, then the State Lands Commission may approve such agreement on behalf of the State.

"The Legislature hereby finds and declares that the entering into and the performance of any such agreement which has been approved by the State Lands Commission will not impair the public trust for commerce, navigation and fisheries to which said granted lands are subject, and that any acts or things done pursuant to the terms thereof or resulting therefrom are consistent with and not in violation of the terms or conditions of any such grant or of any trust, restrictions and conditions appertaining thereto. No such agreement so approved by the State Lands Commission shall effect or result in, or be so construed as to effect or result in a revocation of or change in any trust pertaining to said lands, or in any grant,

conveyance, alienation or transfer of said lands, or any part thereof, to any other individual, firm, or corporation, even though such agreement provides for the pooling of oil, gas or other hydrocarbon substances produced from said lands with oil, gas or other hydrocarbon substances produced from other lands, or results in the migration of any oil, gas or other hydrocarbon substances between said lands and other lands. Any trusts, restrictions or conditions pertaining to any production from said granted lands included in any such agreement, or to any proceeds from such production, shall apply only to that part of the production or that part of the proceeds therefrom which is allocated to such city, county or city and county on account of said lands under any such agreement, and shall not apply to any other production or the proceeds therefrom, whether or not the same may have been produced from said lands or other lands.

"If approved by the State Lands Commission, any such agreement shall bind the State [and the parties thereto]...."

In 1958 the Legislature enacted section 7058 of the Public Resources Code to provide that political subdivisions may commit all land subject to their jurisdiction to unit agreements in proper cases. It also provides that "If any such unit or co-operative agreement includes tide and submerged lands which have been granted to a city, county, or city and county by a grant which does not reserve to the State the right to produce oil and gas therefrom, then the agreement shall comply with the requirements of Section 6879 of this code, and shall bind the State only if approved by the State Lands Commission pursuant to the provisions of Section 6879. Subject to the foregoing, and notwithstanding any competitive bidding requirements or restrictions on term contained in this chapter, or any other statute, including but not limited to Section 718 of the Civil Code, Sections 37383 and 37384 of the Government Code and Chapter 29 of the 1956 Statutes, First Extraordinary Session, any such city, county, city and county, or district may negotiate and execute all agreements necessary to effectuate, implement or modify any such unit or co-operative agreement, including the power to bind and commit lands, including tide and submerged lands, or any interest in lands, to the co-operative or unit agreement for the full term thereof, irrespective of whether the term thereof is for a period extending over the life of the field or for any other indefinite period, and irrespective of the termination date of any lease, contract or other agreement then in effect as to such lands. The power

of any such city, county, city and county, or district to enter into unit or co-operative agreements shall include the power to do such other acts or things and to incur such other commitments and obligations as are customary in unit or co-operative agreements.''

■ Although the agreements in the present case comply with the express terms of the foregoing sections, respondent contends that those sections may not properly be interpreted to permit the city to delegate its powers as trustee of public property to private corporations and individuals. There is nothing in the statutory provisions, however, that requires that unit agreements covering city lands vest control of unit operation of such land in the city. Moreover, such a requirement would defeat the objective of unitary operation in any case, such as the present one, in which a city is a minority owner of lands overlying an oil or gas pool. ■ Unit operation necessarily requires that operating control over each parcel be shifted from the individual owner of that parcel to the owners as a group acting through their selected representatives, and only if each owner is given a voice in management commensurate with his interest, can voluntary unitization be expected. Thus, it would be unreasonable to assume that upland owners of a substantial majority of the oil and gas interests in a common pool would be willing to cede complete operating control to a city so that the city could retain both full operating control of its own land and secure the necessary unitary control over the other lands overlying the pool. Only by placing the city in such a preferred position, however, could unit operation be achieved without modifying the city's preexisting rights as trustee of public lands. To insist on such a preferred position for the city would not only be unfair to the other owners, but by discouraging them from accepting voluntary unitization, would defeat the very objective to be achieved. ■ Accordingly, the authorization to commit public lands to unit agreements necessarily includes the right to cede operating control of oil and gas production to the owners acting as a group pursuant to an equitable distribution of voting power. Such cession is a reasonable means of promoting the vital public interest in arresting land subsidence and increasing the production of oil and gas.

■ Respondent contends, however, that the agreement violates section 3 of article XV of the California Constitution, which provides: ''All tidelands within two miles of any incorporated city or town in this State, and fronting on the waters of any harbor, estuary, bay, or inlet used for the pur-

poses of navigation, shall be withheld from grant or sale to private persons, partnerships, or corporations." It is settled, however, that a lease does not constitute a grant or sale within the meaning of this provision (*San Pedro etc. R.R. Co.* v. *Hamilton*, 161 Cal. 610, 617-620 [119 P. 1073, 37 L.R.A. N.S. 686]; *Boone* v. *Kingsbury*, 206 Cal. 148, 184 [273 P. 797]; *City of Long Beach* v. *Marshall*, 11 Cal.2d 609, 621 [82 P.2d 362]; see also *Mallon* v. *City of Long Beach*, 44 Cal.2d 199, 206 [282 P.2d 481]), and the possessory interests in land created by the agreements in this case are no more extensive than those that might validly be created by ordinary leases. Accordingly, the agreements do not violate section 3 of article XV.

 Finally, respondent contends that the agreements are invalid on the ground that the city did not comply with the competitive bidding requirements of sections 7058.5 and 7059 of the Public Resources Code. These sections were enacted in 1959 (Stats. 1959, ch. 1457, p. 3751, §§ 1-2), the year after the Legislature had excluded unit agreements from any competitive bidding requirements by enacting section 7058. In the same 1959 legislation, however, the Legislature provided that sections 7058.5 and 7059 "shall not apply to activities regulated by Chapter 29 of the Statutes of the 1956 First Extraordinary Session." (Pub. Resources Code, § 7061; Stats. 1959, ch. 1457, p. 3752, § 4.) Chapter 29 is the legislation enacted to settle the dispute between city and state over the division of oil and gas royalties. It regulates oil and gas production from the Long Beach tide and submerged lands and contains its own competitive bidding requirements. Those requirements, however, were expressly made inapplicable to unit agreements by section 7058. Moreover, even if section 7061 did not make sections 7058.5 and 7059 inapplicable to activities regulated by chapter 29, they would not apply to the agreements in this case. Thus, sections 7058.5 and 7059 did not expressly repeal the provision of section 7058 that "notwithstanding any competitive bidding requirements . . . contained in this chapter, or any other statute, . . . any such city, county, city and county, or district may negotiate and execute all agreements necessary to effectuate, implement or modify any such unit or co-operative agreement . . . ," and the very nature of unit agreements compels the conclusion that there was no repeal by implication. Competitive bidding is a method by which a party determines with whom he will contract. In the case of unit agreements, however, the parties are necessarily the persons having rights to produce oil and gas from the

common pool, and the rights and duties of such persons under a unit agreement must necessarily be determined by negotiations among them. Competitive bidding makes no sense in this context. Accordingly, we conclude that the bidding requirement applicable to "a lease or any operating agreement or other type of agreement for the production of oil, gas or other hydrocarbons" (Pub. Resources Code, § 7058.5) refers to such leases or agreements that the city is free to enter into by itself with any qualified person to secure production from its own lands, but not to unit agreements or unit operating agreements that must necessarily be negotiated with the other owners of interests in the common pool. We thereby give effect to both section 7058 and section 7058.5 and avoid conflict between them. (See *Hough* v. *McCarthy*, 54 Cal.2d 273, 279 [5 Cal.Rptr. 668, 353 P.2d 276].)

Let the peremptory writ of mandate issue as prayed for.

Gibson, C. J., Schauer, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.