[No. B170985. Second Dist., Div. Eight. Jan. 7, 2005.]

STATE OF CALIFORNIA ex rel. CALIFORNIA STATE LANDS
COMMISSION, Plaintiff and Respondent, v.
CITY OF LONG BEACH, Defendant and Appellant.

768

**COUNSEL**

Robert E. Shannon, City Attorney, Belinda R. Mayes, Principal Deputy City Attorney, and J. Charles Parkin, Deputy City Attorney, for Defendant and Appellant.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, J. Matthew Rodriquez, Assistant Attorney General, and Alan V. Hager, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

BOLAND, J.—

## SUMMARY

The City of Long Beach (the City) is the owner of the Long Beach tidelands, holding them in trust for the people of the State of California for purposes of navigation, commerce and fishing. The City derives oil revenue from the Long Beach tidelands, a substantial portion of which has been freed from the public trust as no longer necessary for trust purposes. The freed revenues must be paid to the State of California (the State), which may use them for any purpose. The City is permitted to retain, out of oil revenue each month, an amount equal to all subsidence costs and money expended by the City in administering oil and gas operations. The City must pay to the State the remaining oil revenue, except for an annual lump sum amount to be used for specified trust purposes.

In 1999 the City, faced with the certainty of large future costs—estimated by the State and City to be at least $200 million—for oil well plugging and abandonment and facility removal, created an abandonment reserve fund. The reserve was funded through a continuing monthly per barrel charge based on tidelands oil production. The City retained these funds monthly from oil revenue, along with amounts equal to the other moneys it expended in administering oil and gas operations, before paying over the remaining oil revenue to the State. The revenues retained for this purpose were deposited in an abandonment reserve fund, which currently contains over $62 million.

The State sought a writ of mandate, to compel the City to cease withholding funds for future plugging and abandoning of tidelands oil wells, and to compel the City to pay to the State all funds previously withheld. The State contended that the applicable statute permits the City to withhold only moneys the City has actually "expended" in administering tidelands oil operations. Depositing moneys in an abandonment reserve fund is not expending the money, according to the State; the expense for well plugging and abandonment will occur "only after . . . the revenue stream from production operations ends," when no tidelands oil revenue will be available to pay the cost. The trial court found the City unlawfully withheld the money it deposited in the abandonment reserve fund, and issued a peremptory writ, commanding the City to stop withholding moneys for deposit in the abandonment reserve, to terminate the abandonment reserve, and to pay all of the money in the abandonment reserve to the State.

We conclude the applicable statute authorizes the City to create and maintain an abandonment reserve fund to cover oil production costs that are certain to occur and can be reasonably estimated, and reverse the trial court's judgment.

## BACKGROUND

At issue is the interpretation of chapter 138, section 4, of Statutes 1965, First Extraordinary Session 1964, page 432, which governs the revenues from the sale or disposition of oil and gas derived from the Long Beach tidelands. The resolution of the statutory interpretation question, however, will be assisted by a review of the legal history of the Long Beach tidelands. We describe that background before turning to chapter 138, and then to the facts that gave rise to this litigation.

### A.   *The historical context.*

The State of California became the owner of tidelands when it was admitted to the union, holding them subject to the public trusts for navigation, commerce and fishing.[1] The State likewise became the owner of the minerals in the tidelands. (*City of Long Beach v. Marshall* (1938) 11 Cal.2d 609, 614 [82 P.2d 362]. In 1911, the State granted the City of Long Beach all of its right, title and interest in the tidelands situated within the boundaries of the city, to be held in trust and used to establish a harbor and to construct anything necessary or convenient for the promotion of commerce and navigation. (*Id.* at p. 613, citing Stats. 1911, ch. 676, p. 1304.) With this grant, fee simple title to the Long Beach tidelands passed to the City, along with the mineral rights in the tidelands, subject to the public trusts and limitations and reservations specified in the grant.[2] (*City of Long Beach v. Marshall, supra,* 11 Cal.2d at p. 616.)

The terms of the State's original grant of its interest in the Long Beach tidelands were amended by the Legislature in 1925 and 1935, enlarging the terms of the original grant. (*City of Long Beach v. Morse* (1947) 31 Cal.2d 254, 261 [188 P.2d 17].)[3] In 1939, the City began to produce large quantities of oil, gas and other hydrocarbon substances from the tidelands, generating so

---

[1] "Tidelands are properly those lands lying between the lines of mean high and low tide [citation] covered and uncovered successively by the ebb and flow thereof [citation]." (*Marks v. Whitney* (1971) 6 Cal.3d 251, 257–258 [98 Cal.Rptr. 790, 491 P.2d 374].)

[2] The tidelands were conveyed " 'to be forever held by said city, and by its successors, in trust for the uses and purposes, and upon the express conditions following . . . .' " (*City of Long Beach v. Marshall, supra,* 11 Cal.2d at p. 613, italics omitted, quoting Stats. 1911, ch. 676, pp. 1304–1305.) These conditions included a prohibition on conveying or alienating the lands, except that the City could grant franchises for public uses, and leases for limited periods, for purposes consistent with the trusts. The State reserved the right to fish in the waters of the harbor and the right of convenient access to the waters over the tidelands for that purpose. (Stats. 1911, ch. 676, p. 1305.)

[3] The 1925 act was designed "to remove some of the restrictions on the use of the lands and to permit it to be devoted to such uses as 'public park, parkway, highway, playground', etc.," and the 1935 act amended the 1925 act "so as further to enlarge these purposes . . . ." (*City of Long Beach v. Marshall, supra,* 11 Cal.2d at p. 618; see Stats. 1925, ch. 102, p. 235; Stats. 1935, ch. 158, p. 793.)

much revenue that its expenditure for trust uses and purposes was "economically impractical, unwise and unnecessary." (Stats. 1951, ch. 915, § 1, pp. 2444–2445.) In 1951, the Legislature determined that 50 percent of the revenues from oil, gas and other hydrocarbon substances other than "dry gas," and all of the revenues from "dry gas," were no longer required for navigation, commerce and fisheries, "nor for such uses, trusts, conditions and restrictions as are imposed by" the acts granting the tidelands to the City. (*Ibid.*) Consequently, the Legislature declared those revenues "to be free from the public trust for navigation, commerce and fisheries, and from such uses, trusts, conditions and restrictions as are imposed by any of [those] acts." (*Id.,* § 2, p. 2445.)

In *Mallon v. City of Long Beach* (1955) 44 Cal.2d 199, 206 [282 P.2d 481] (*Mallon*), the Supreme Court addressed the validity and effect of the 1951 statute, holding that the partial revocation of the public trust on the income derived from the Long Beach tidelands was a valid exercise of legislative power.[4] (*Mallon, supra,* 44 Cal.2d at pp. 206–207.) "Such a partial revocation of the trust will in no way impair the public interest in commerce, navigation, and fisheries in Long Beach harbor . . . ." (*Id.* at p. 206.) The Court observed that the Legislature had determined that, to the extent affected by the partial revocation, the income derived from the production of oil and gas from the Long Beach tidelands was no longer required for trust purposes, and that the legislative finding "is conclusive upon this court in the absence of evidence indicating that the abandonment of the public trust will impair the power of succeeding legislatures to protect, improve, and develop the public interest in commerce, navigation, and fisheries." (*Id.* at pp. 206–207.) *Mallon* also determined that the State, not the City, was entitled to the revenue freed from the trust by its partial revocation. (*Id.* at pp. 207–208.)[5]

---

[4] The Supreme Court explained it was well established that the state may reclaim tide and submerged lands from the sea, "where it can be done without prejudice to the public right of navigation," and may apply those lands to other purposes and uses. (*Mallon, supra,* 44 Cal.2d. at p. 206, citing cases.) This principle, the court observed, had never been judicially applied in California "to the partial revocation of the public trust as to the income derived from the extraction of minerals imbedded in the lands subject to the trust . . . ." (*Ibid.*) However, the court saw no distinction between the reclamation of peripheral lands that become unusable for purposes of the trust, "and the reclamation of part of the minerals imbedded in the lands subject to the trust that likewise become unnecessary for the purposes of the trust." (*Ibid.*)

[5] The Supreme Court cited private trust principles under which a trustee normally holds title to the corpus of the trust only for the purpose of carrying out the objects of the trust, and "[w]hen the trust is terminated, the corpus does not become the individual property of the trustee; it reverts to the settlor." (*Mallon, supra,* 44 Cal.2d at p. 208.) The court further concluded that if the statutory revocation operated as a transfer of the affected moneys to the city, the transfer would be a gift of public moneys in violation of the state Constitution. (*Id.* at p. 210.) The court thus held that the partial revocation of the trust effected by the 1951 statute

B. *Statutes 1965, First Extraordinary Session 1964, chapter 138.*

We come now to the statute at issue, which the parties refer to as "chapter 138." After the *Mallon* case, exploration disclosed the existence of extensive additional deposits of oil and gas in and under the Long Beach tidelands. The Legislature determined that development of those deposits would result in very substantial augmentations of oil revenue, and that expenditure of those revenues for trust purposes would be unwise and unnecessary. "Economically practicable, wise and necessary expenditures of oil revenue by the City of Long Beach" were limited "to the purposes hereinafter provided, and to the amounts hereinafter provided to be retained by the City of Long Beach." (Stats. 1965, 1st Ex. Sess. 1964, ch. 138, § 2, p. 433.) The increased amount of oil revenue to be paid to the State free from the public trust made it necessary for the State to increase its control over oil and gas production operations and standards. (*Ibid.*) Thus, chapter 138 provided a detailed plan for the development of the reserves in East Wilmington and portions of downtown Long Beach.

■  Chapter 138 requires the City to "account for and pay over monthly to the State" oil revenue and dry gas revenue, free from the public trust, and to retain specified amounts or percentages of oil revenue for trust uses and purposes.[6] These provisions are at issue in this litigation. The "oil revenue" in question is defined as follows: " 'Oil revenue' means the net proceeds received by the City of Long Beach from the sale or disposition of oil, gas and other hydrocarbon substances (other than dry gas) derived from, or allocated or assigned to, the Long Beach tidelands, including advance payments, after deducting moneys expended for the extraction and sale or disposition thereof and conducting repressuring operations and for the satisfaction of obligations attributable to such extraction or sale or disposition." (Stats. 1965, 1st Ex. Sess. 1964, ch. 138, § 1, subd. (b), p. 431.)

Section 4, subdivision (d) provides: "The city shall retain out of oil revenue each month an amount equal to all subsidence costs thereafter expended by the city and an amount equal to the money thereafter expended by the city in administering oil and gas operations on the Long Beach tidelands (to the extent, if any, such amount is not deductible under Section 1(b) hereof), and shall pay out of oil revenue to the State Lands Commission for and on behalf

---

"necessarily results in a reversion to the state of the monies thus released from the trust, and the city holds those funds upon a resulting trust for the state." (*Id.* at p. 212.)

[6] Section 4, subdivision (b) states: "Commencing on the first day of the calendar month following the date on which this act becomes effective, the City of Long Beach shall account for and pay over monthly to the State of California oil revenue and dry gas revenue free from the public trust for navigation, commerce and fisheries and from such uses, trusts, conditions and restrictions as were imposed by said acts of 1911, 1925 and 1935, and the city shall retain, subject to the provisions of this act, the amounts or percentages of oil revenue hereinafter provided." (Stats. 1965, 1st Ex. Sess. 1964, ch. 138, § 4, subd. (b), p. 439.)

of the State of California each month an amount equal to the money thereafter expended by the State . . . in administering this act . . . The oil revenue remaining after deducting and paying said amounts shall hereafter be referred to as 'remaining oil revenue.' " (Stats. 1965, 1st Ex. Sess. 1964, ch. 138, § 4, subd. (d), pp. 439–440.)

■ The "remaining oil revenue" is to be paid over monthly to the State, free from the public trust, except that the City retains a specified amount to be used for trust purposes. (Stats. 1965, 1st Ex. Sess. 1964, ch. 138, § 4, subd. (e), pp. 440–441.)

### C. *Factual and procedural background of this litigation.*

The oil and gas beneath the Long Beach tidelands are produced under contracts, approved by the State, between the City and oil company contractors. These contracts differ from typical oil and gas leases. In typical leases, the lessee is obligated at the end of the lease to plug and abandon all wells and remove all production facilities from the leased land at the lessee's expense. The contracts between the City and the oil company contractors are terminable by the contractors on notice to the City that the oil and gas production operations under the contracts are no longer profitable. With one exception, the contractors have no obligation to plug and abandon wells and remove production facilities that remain after termination of the contracts. The City and the State believe a substantial number of wells and production facilities will remain after the contracts are terminated, and the costs of plugging and abandoning these wells and removing the facilities may amount to at least $200 million, and up to $500 million if the four artificial islands are removed.

In 1996 the City, faced with the certainty of large well plugging and abandonment and facility removal costs, proposed withholding money from tidelands oil revenue that would otherwise be paid to the State and placing it in an interest-earning account, which would be used to cover these costs. The City secured opinions of its legal counsel that withholding tidelands oil revenues for a reserve to be used for future well abandonment and facilities removal expenditures was permissible under chapter 138. The State took the position that chapter 138 did not permit the City to withhold revenue that would otherwise be payable to the State, except to cover moneys that the City has expended, and that putting money aside in an abandonment fund is not expending money.

On January 24, 2000, the City notified the State that, in furtherance of its fiduciary responsibility to provide actual funding for abandonment work, the City would continue to fund an abandonment reserve, created the previous year, from tidelands oil revenue. The charge would be noted on the City's

monthly statements to the State as an additional obligation attributable to production. The City deposited the retained revenues in an abandonment reserve fund, which as of April 2003 contained over $62 million.[7]

In February 2001, a bill supported by both the City and the State was introduced in the Legislature. The bill, Assembly Bill No. 1519 (2001–2002 Reg. Sess.), provided that, notwithstanding section 4, subdivision (d) of chapter 138, the City could retain, out of monthly tidelands oil revenue, moneys to be deposited in an abandonment fund and used solely for the costs of plugging and abandoning wells and removing production facilities that are not the contractual responsibility of the oil contractors or other parties. The amount was limited to $190 million, and the bill contained other provisions and limitations. The Legislature did not act on the bill.[8]

On April 10, 2002, the State demanded the abolition of the abandonment fund and the payment of the money in the fund to the State, asserting the City had no statutory authority to withhold tidelands oil revenues for future abandonment costs. On May 23, 2002, the City refused, reiterating its position that under existing law it had the authority and the obligation to establish and maintain funding for "this considerable trust liability." Representatives of the City and State met in the fall of 2002 to discuss the State's demand, and again the City refused.

On April 2, 2003, the State filed a petition for writ of mandate, to compel the City to cease withholding funds from tidelands oil revenue for future plugging and abandonment operations, and to immediately pay all funds previously withheld to the State. The State asserted the City was required to pay withheld funds by section 4, subdivisions (d) and (e) of chapter 138. The City opposed the petition, relying upon the entirety of chapter 138 as granting it the authority to create and maintain the abandonment reserve.

The trial court granted the State's petition, stating in its minute order:

"The tidal and submerged lands from which the City of Long Beach derives revenue from the extraction of oil and gas are held in trust by the City for all of the people of the state. Pursuant to that trust, it is the state

---

[7] The reserve was funded through a continuing monthly per barrel charge, based on tidelands oil production for the month, calculated by subtracting the abandonment reserve balance from the estimated abandonment liability and dividing the difference by the estimated remaining oil reserves in barrels. The reserve earned interest which remained in the reserve and was compounded.

[8] Assembly Bill No. 1519 (2001–2002 Reg Sess.) died under article IV, section 10, subdivision (c) of the Constitution. That provision states that any bill introduced during the first year of the biennium of the legislative session that has not been passed by the house of origin by January 31 of the second calendar year of the biennium may no longer be acted on by the house.

legislature, not the city, that determines the extent to which income derived from the production of oil and gas from the tidal and submerged lands of Long Beach Harbor is, or is not, required for the purposes of the trust. All income not so required belongs to the state, not to the City. [Citation.]

"It is therefore up to the state legislature, not to the City of Long Beach, to determine whether some of those revenues must be held in a reserve to cover the costs to plug and abandon the wells when they are no longer usable for the production of oil or gas. The legislature has enacted a comprehensive scheme to regulate and finance the plugging and abandonment of oil wells in the state. The legislature has therefore not considered it necessary to enact legislation setting aside a reserve from oil and gas revenues to plug and abandon wells in Long Beach Harbor."

Judgment granting the State's petition was entered September 4, 2003. The parties stipulated to a stay of the judgment pending the City's appeal, conditioned on the City's agreement to make no further deposits of tidelands oil revenue to the current abandonment reserve. The City filed a timely notice of appeal.

## DISCUSSION

█ At issue is the proper construction of section 1, subdivision (b) and section 4, subdivision (d) of chapter 138: do those provisions allow the City to create and maintain an abandonment reserve for the future payment of the inevitable and substantial costs of plugging and abandoning wells and removing production facilities, or do they forbid it? We conclude that chapter 138, construed in context and in light of the statutory scheme and its history, authorizes the City to create and maintain an oil abandonment reserve to cover costs that are certain to occur and can be reasonably estimated.

█ The principles of statutory interpretation informing our analysis have been summarized many times. The court is required to ascertain the intent of the Legislature so as to effectuate the purpose of the law, looking first to the words of the statute, and giving them their usual and ordinary meaning. (*In re Marriage of Hobdy* (2004) 123 Cal.App.4th 360, 366 [20 Cal.Rptr.3d 104] (*Hobdy*).) " ' "However, the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose." ' " (*Ibid.*, quoting *In re Marriage of Armato* (2001) 88 Cal.App.4th 1030, 1035 [106 Cal.Rptr.2d 395].) The meaning of a statute is not determined "from a single word or sentence. Instead, we construe the words and sentences in context and in the light of the statutory scheme." (*Department of Industrial Relations v. Lee* (1999) 73 Cal.App.4th 763, 767 [86 Cal.Rptr.2d 710].) If the terms of the statute

provide no definitive answer, the court looks to " 'a variety of extrinsic aids, including the ostensible objects to be achieved, . . . the legislative history, public policy, . . . and the statutory scheme of which the statute is a part. [Citations.]' " (*Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 744 [38 Cal.Rptr.2d 650, 889 P.2d 970], quoting *People v. Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154].)

Applying these principles of construction to chapter 138, we conclude the Legislature did not intend to release from the public trust tidelands revenues that are reasonably necessary for trust purposes. Those purposes expressly include "administering oil and gas operations on the Long Beach tidelands" (*id.*, § 4, subd. (d)), and "the satisfaction of obligations attributable to [the] extraction or sale or disposition" of oil and gas. (*id.*, § 1, subd. (b).) Indeed, the State concedes that expenses for plugging and abandoning wells and removing facilities "would be an oil field administrative cost that would be deductible from the oil revenue payable to the State," and that "well plugging and abandonment is an obligation attributable to the extraction of oil."

The State insists, however, that the Legislature's use of the verb "expend," when referring to money the City may withhold from monthly oil revenues for these purposes, refers "only to money the City has spent." "Money spent has been consumed," the State contends, and money in a reserve has not been consumed. We cannot agree with the State's analysis, for several reasons.

First, the State's interpretation of chapter 138 focuses upon a single term: the word "expended," as used in section 4, subdivision (d): "The city shall retain out of oil revenue each month . . . an amount equal to the money thereafter expended by the city in administering oil and gas operations on the Long Beach tidelands (to the extent, if any, such amount is not deductible under Section 1, subdivision (b) hereof) . . . ." The word is also used in section 1, subdivision (b), defining oil revenue as: "the net proceeds received by the City of Long Beach from the sale or disposition of oil [and] gas . . . derived from . . . the Long Beach tidelands . . . after deducting moneys expended for the extraction and sale or disposition thereof and conducting repressuring operations and for the satisfaction of obligations attributable to such extraction or sale or disposition."

Contrary to the State's contention, more than one definition exists for the word "expend." One of them, of course, is "to pay out: spend." (Webster's 9th New Collegiate Dict. (1989) p. 437.) Another is "to make use of for a specific purpose: utilize." (*Ibid.*; see also 3 Oxford English Dict. (1933) p. 428 ["to employ for a given purpose"].) While the City is not consuming the moneys in the abandonment reserve fund, it is arguably utilizing those moneys for a specific purpose, by transferring them to a reserve fund allotted for future expenses certain to occur. Consequently, we reject the proposition

that money "expended" must necessarily be simultaneously consumed or used up. At a minimum, the use of the term is ambiguous. Moreover, the City's accountants have opined that abandonment costs are an expense of oil field operations and, under generally accepted accounting principles and industry accounting practices, substantial authority supports charging current operations for future anticipated costs related to well abandonment.[9]

Second, even if "expend" ordinarily means "consume," we would be remiss if we determined the meaning of a statute "from a single word or sentence." (*Department of Industrial Relations v. Lee, supra*, 73 Cal.App.4th at p. 767.) Instead, we must determine whether the literal meaning of a statute comports with its purpose, and construe the words in context and in light of the statutory scheme. (*Hobdy, supra*, 123 Cal.App.4th at p. 366.) This case is a paradigm for application of those rules of construction. The literal meaning of the statute—assuming "expend" literally means "consume"—does not comport with the purpose of the statute, and we decline to construe the statute based on the literal meaning of a single word. Our obligation is to determine the intent of the Legislature so as to effectuate the purpose of the law. An examination of the purpose of chapter 138 and the statutory scheme compels us to reject the notion that the Legislature intended to deprive the City of tidelands oil revenues to defray costs that are clearly necessary for trust purposes, solely because the cost in question is a future rather than a current cost and the Legislature used the word "expended."[10]

Primary among the purposes of chapter 138 was to free from the public trust the "very substantial augmentations" of oil revenue that would be derived from recently discovered deposits of oil and gas. Use of those revenues by the City "for the uses and purposes required by law [i.e., trust purposes] would be economically impracticable, unwise and unnecessary. Economically practicable, wise and necessary expenditures of oil revenue by

---

[9] The City obtained an opinion from its accountants in 1996, stating there was substantial authority, under generally accepted accounting principles and industry accounting practices, to support "[r]ecording a liability recognizing future costs of oil well abandonment and site restoration costs" and "[c]harging current operations for future anticipated costs related to well abandonment and site restoration based on a formula that allocates costs over the remaining production life of the field."

[10] The trial court correctly observed that the Legislature, not the City, determines the extent to which income derived from the production of oil and gas from the Long Beach tidelands is, or is not, required for the purposes of the trust. As *Mallon* established, the Legislature may revoke the trust for income no longer required for trust purposes. The trial court, however, then concluded it was up to the Legislature, not the City, to determine whether some of those revenues must be held in a reserve to cover the costs to plug and abandon the wells. This conclusion, we think, avoided a direct answer to the question of statutory construction and legislative intent presented in this case: that is, whether, by virtue of section 4, subdivision (d) of chapter 138, the Legislature intended to prohibit the City from deducting moneys from oil revenue for future well plugging and abandonment, and thus to free those funds from the public trust.

the City of Long Beach are limited to the purposes hereinafter provided, and to the amounts hereinafter provided to be retained by the City of Long Beach." (Stats. 1965, 1st Ex. Sess. 1964, ch. 138, § 2, subd. (b), p. 433.)

Thus, the Legislature determined that most of the extensive oil revenues to be derived from the Long Beach tidelands were no longer needed for trust purposes, and therefore should be freed from the trust. On the other hand, the Legislature expressly provided for the use of oil revenue for the extraction, sale and disposition of the oil and gas "and for the satisfaction of obligations attributable to such extraction or sale or disposition." (Stats. 1965, 1st Ex. Sess. 1964, ch. 138, § 1, subd. (b), p. 431.) Thus, moneys for those purposes were not freed from the trust. Indeed, the Legislature described the moneys freed from trust uses as moneys whose use for trust purposes would be "economically impracticable, unwise and unnecessary." (*Id.*, § 2, subd. (b), p. 433.) Those adjectives cannot reasonably be applied to moneys to be utilized for well plugging and abandonment.

██ Finally, public policy considerations are among the extrinsic aids to which the court may look when construing the meaning of ambiguous statutory language. (*Granberry v. Islay Investments, supra,* 9 Cal.4th at p. 744.) The public interest in the Long Beach tidelands—which the City holds in trust for the people of the State of California—necessarily includes their protection and preservation.[11] Indeed, state law expressly requires the plugging and abandonment of an oil or gas well that is no longer used, "to ensure that it does not pose a hazard to safety or the environment."[12] (*Wells Fargo Bank v. Goldzband* (1997) 53 Cal.App.4th 596, 604 [61 Cal.Rptr.2d 826].) These principles further support the conclusion that the Legislature, when it freed oil revenues from the public trust as unnecessary for trust purposes, did not intend to free revenues necessary to cover an essential obligation attributable to the extraction of the oil that generated those revenues—plugging and abandoning the wells.

The State offers several further arguments for its position that chapter 138 does not authorize the City to place oil revenues in a reserve fund for future plugging and abandonment costs. We briefly address each of them.

---

[11] Cf. *Marks v. Whitney, supra,* 6 Cal.3d at pages 259–260 ("[t]here is a growing public recognition that one of the most important public uses of the tidelands—a use encompassed within the tidelands trust—is the preservation of those lands in their natural state, so that they may serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the scenery and climate of the area").

[12] "A well is properly abandoned when it has been shown . . . that all proper steps have been taken to isolate all oil-bearing or gas-bearing strata encountered in the well, and to protect underground or surface water suitable for irrigation or farm or domestic purposes from the infiltration or addition of any detrimental substance and to prevent subsequent damage to life, health, property, and other resources." (Pub. Resources Code, § 3208.)

■ First, the State argues that the Legislature intended "that the City operate on a cash basis." The authority it offers for this assertion is the use in section 4, subdivision (d) of the word "expended," a point we have addressed above. The State also says the Legislature's intent is evidenced by the fact that it expressly created a reserve for subsidence contingencies, in section 4, subdivision (f). This section requires the contractors' agreement to include a provision for a reserve for subsidence contingencies. The funds are treated as a cost of oil production under the contractors' agreement, and are available to indemnify the City, the State and the contractors from claims and judgments arising from subsidence occurring as a result of operations under the agreement. In addition, "[s]aid fund may also be used for the purpose of paying subsidence costs or for conducting repressuring operations in the event there is no oil revenue or the oil revenue is insufficient to pay such costs." (Stats. 1965, 1st Ex. Sess. 1964, ch. 138, § 4, subd. (f), p. 441.)[13] The State argues the Legislature's approval of this reserve means that "it impliedly rejected the creation by the City of any other reserve." We do not agree. The reserve fund for subsidence contingencies is a part of the contractors' agreement, and is deductible in computing the net proceeds received by the City from the contractors. Moreover, it is a contingency reserve for events that may or may not happen. We decline to find, from this contingency provision, that the Legislature "impliedly rejected" the use of oil revenues for administrative costs of oil production—well plugging and abandonment—that are certain to occur and reasonably calculable.

■ Second, the State argues that its reading of section 4, subdivision (d) is reinforced by the Legislature's refusal to enact legislation—Assembly Bill No. 1519 (2001–2002 Reg Sess.)—that would have expressly authorized the City to establish an abandonment reserve. Again, the State is mistaken. No inference may be drawn from a bill upon which the Legislature took no action. In the case the State cites, *Beverly v. Anderson* (1999) 76 Cal.App.4th 480 [90 Cal.Rptr.2d 545], the Legislature passed a bill after deleting a provision included in an earlier version of the bill. This specific rejection of a provision was considered very persuasive in concluding the statute should not be construed to incorporate the provision that was deleted. (*Id.* at pp. 485–486.) The same cannot be said of a bill upon which the Legislature never voted. Indeed, an equally reasonable inference is that the Legislature saw no need for the bill. Either conclusion is pure speculation.

Third, the State argues that the City, as trustee for the public of the tidelands, must abide strictly by the terms of the trust agreement, using the trust assets for the purposes and in the manner prescribed by the trust grant. While that is correct, the contention merely returns us to the original

[13] Section 4, subdivision (f) was amended by Statutes 1982, chapter 246, section 1, pages 791–792; the amendment did not change the provisions addressed in the text.

question: did the Legislature, by using the word "expended" in section 4, subdivision (d), intend to forbid the City from reserving funds from tideland oil revenues for well plugging and abandonment, a use the State concedes is otherwise "a proper use of tidelands oil revenue" and "a proper and prudent trust use"?[14] For the reasons discussed above, we cannot ascribe any such intention to the Legislature.

## CONCLUSION

We conclude by recalling that the State of California became the owner of its tidelands on its admission to the union, holding them subject to the public trusts for navigation, commerce and fishing, and that it granted the Long Beach tidelands to the City subject to those same trusts. (*City of Long Beach v. Marshall, supra,* 11 Cal.2d at p. 614.) As was settled in *Mallon, supra,* 44 Cal.2d 199 the state has the power to revoke the trust, as to tidelands or income derived from them, to the extent it determines the lands or revenues have become unnecessary for purposes of the trust. It did so in 1951, and again in chapter 138. The question we decide is merely the extent of the revocation.

When the Legislature determined the amounts of oil revenue to free from the trust, we do not think it intended to release any revenue necessary to satisfy any obligation, present or future, attributable to the extraction of the oil and gas from the tidelands. Well plugging and abandonment are required by law to ensure that unused wells do not create hazards to our environment. The costs thereof are unquestionably "attributable to [the] extraction or sale or disposition" of oil and gas from the tidelands—a category of expense expressly made deductible by the Legislature in calculating oil revenue. Viewing chapter 138 in context and in light of its history and public policy, as we are required to do, we conclude nothing in that chapter precludes the City from creating and maintaining an oil abandonment reserve to cover costs that are certain to occur and can be reasonably estimated.

---

[14] Chapter 138 requires the City to file annually with the State Lands Commission and the Legislature "a detailed statement of all expenditures of oil revenue, other than that required in this act to be paid to the State, including obligations incurred but not yet paid." (Stats. 1965, 1st Ex. Sess. 1964, ch. 138, § 10, p. 458.) In addition, each year the auditor general must "audit the Long Beach tideland revenues and expenditures and report thereon to the Legislature." (*Ibid.*) Accordingly, there is no reason for concern about use of the abandonment reserve fund for any purpose other than that for which it was created, a use the State concedes is proper and prudent.

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court with instructions to vacate its order granting the petition for writ of mandate and to enter a new order denying the petition. The City of Long Beach is entitled to recover its costs on appeal.

Rubin, Acting P. J., and Flier, J., concurred.

Respondent's petition for review by the Supreme Court was denied March 30, 2005. Kennard, J., was of the opinion that the petition should be granted.